**U.S. DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| QUALITY AIR SERVICES, LLC | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MILWAUKEE VALVE COMPANY, INC. | ) | Civil Action No. 1:08-cv-00690 |
| d/b/a HAMMOND VALVE COMPANY | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

Comes now the Plaintiff Quality Air Services, LLC, by and through counsel and hereby files this opposition to Defendant's Motion to Dismiss. As grounds for this opposition, Plaintiff states as follows.

As noted in the Complaint, Plaintiff has installed approximately 13,000 water valves within the past two years that were manufactured by Defendant. These valves are in essence brass shut off valves for hot and cold water piping. While the traditional life expectancy of such valves is normally measured in decades, Defendant's valves have been fracturing in a matter of months. No actions by the Plaintiff have contributed to these fractures, and the fractures are following a similar pattern.

Plaintiff has installed at least two thousand five hundred valves in commercial units and multi-family dwellings in the District. At least one of the Defendant's valves has failed in the District at the identical stress point at which those in Virginia and in Maryland also failed.

1

Plaintiff has been and will be forced to replace all of the Hammond valves; a failure to do so creates the risk of having additional valves fail. Serious personal injury and property damage is likely to result.

Rather than address the deficiencies of the valves and the very real and concrete harm they create for residents in Maryland, Virginia and the District of Columbia, Defendant has filed a motion to dismiss based predominantly on a claim of lack of jurisdiction. For the reasons set forth below, Defendant's Motion should be dismissed.

## I. <u>In Personam Jurisdiction Exists Over Defendant.</u>

Defendant provides the Court with a virtual law review article on in personam jurisdiction, and then argues that there is no jurisdiction in the District of Columbia because Defendant has no distributor of valves in the physical vicinity of the District of Columbia and has no corporate offices in the District; and while Hammond has shipped valves to the District of Columbia to specific "job sites" (also known as homes and buildings) at a rate of at least fifteen per annum for the last ten years, these shipments do not constitute sufficient minimum contacts or the necessary purposeful availment that allows a court in the District of Columbia to exercise jurisdiction without offending due process. This self serving and untested argument can be summarily rejected.

Rather than regurgitate the full panoply of black letter law on the issue of in personam jurisdiction, Plaintiff notes the following essentials.

In the seminal case of <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945), the United States Supreme Court rejected a geographical test for in personam jurisdiction and instead adopted the far more fluid and intensely factual inquiry of "minimum contacts" with the applicable forum. The Court determined that where an

entity's contact with a forum is "continuous and systematic" and where the cause of action arose out of the activities, the exercise of jurisdiction is always constitutionally permissible. It is not the quantity, but rather the nature and quality of the defendant's activities which determine whether the extension of jurisdiction offends the due process imposed by the requirement of minimum contacts.

In a products liability action such as this, the issue is whether the Defendant's conduct and connection with the forum state are such that it should reasonably anticipate being haled into court there. World Wide Volkswagen v. Woodson, 444 U.S. 286, 297 (1980). The inquiry then focuses factually on the "relationship among the defendant, the forum and the litigation." Rush v. Savachuck, 444 U.S. 320, 327 (1980). The basic question is then whether the connection, the forum and the litigation render it fair to hale the Defendant into court. McDaniel v. Armstrong World Industries, 603 F. Supp. 1337 (D.D.C. 1985).

The mechanism by which jurisdiction is effected against a non party is through a state's "long arm" statute. In diversity actions, such as the instant case, the court will initially look to the District of Columbia's long arm statute contained at D.C. Code Section 13-423 to determine whether it has personal jurisdiction, Novak-Canzeri v. Saud, 864 F. Supp 203 (D.D.C. 1994); and then to determine whether that exercise comports with due process. Banks v. Lappin, 539 F. Supp. 2d 228 (D.D.C. 2008).

These issues are not subject to mechanical tests and the facts of each case must be weighed on a case by case basis using notions of fairness, reasonableness and substantial justice. Shoppers Food Warehouse v. Morena, 746 A2d 320; (D.C. Cir.) cert. den. 530, U.S. 1270 (2000).

Under the District of Columbia's long arm statute, there are four categories of conduct in cases such as this which govern whether jurisdiction exists. They are:

(1)    transacting business in the District of Columbia;

(2)    contracting to supply services in the District of Columbia;

(3)    causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; and

(4)    causing tortious injury in the District of Columbia by any act of omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct or derives revenue from goods used or consumed or services rendered in the District of Columbia.  See D.C. §13-423 (a) 1-(4).

It is black letter law that if a defendant's conduct is covered by one of the relevant sections of D.C. Code §13-423, it is permissible to assert jurisdiction since the long arm statute is "co-extensive with the Constitution's due process limit." e.g. <u>Dickson v. United States,</u> 831 F. Supp. 893, 897 (D.D.C. 1993). The only requirement to establish the jurisdictional prerequisite is that the Defendant engage in some affirmative act that would establish minimum contacts. <u>Berwyn Fuel Inc., v. Hogan,</u> 399 A2d 79, 80 (D.C. 1979).

Under §13-423 (a)(1) minimum contacts are established if it can be shown the defendant is transacting business in the District of Columbia. The Defendant freely admits he has. At page 3 of its Motion, Defendant states, "Milwaukee Valve has, on rare occasions and only at the specific request of a distributor, which all are located out the District of Columbia, shipped valves directly to specific jobs sits within the District of Columbia ... such shipments have been made no more than an <u>average</u> of 15 times per

year"[1] (emphasis supplied) "over a course of at least the last ten years." This amounts to

at least 150 admitted instances of making direct shipments into the District.[2]

Common sense and case law clearly support the exercise of jurisdiction over a

nationwide distributor of products who by its own admission regularly ships into the

forum directly products for use in the piping of homes and businesses.

First, the Company admits in the affidavit of a senior corporate officer that "the

company has shipped some of its products into the District of Columbia." *See*, Affidavit

of George McLaughlin at ¶12.

Second, the Company on its website lists regional managers in both Virginia and

Maryland and touts itself as a nationwide distributor of valves for use in both residential

and commercial water and other systems (Exhibit 1). The use of regional distributors

whose territories straddle the surrounding states clearly indicates that Defendant was

aware its products would be sold and used in this forum. Barone v. Rich Bros. Interstate

Display Fireworks Co., 25 F.3d 610, 612-615 (8th Cir. 1994) (Defendant's knowledge

that regional distributors were overseeing sales in adjoining states sufficient to establish

jurisdiction in forum since Defendant's must have known of sales within the forum).

See, Pennzoil Products v. Colle Ui & Associates, Inc., 149 F.3d 197 (3d Cir. 1998).

As Plaintiff has alleged in its Complaint and Defendant has not denied, it sold the

---

[1] Defendant fails to state how the average was achieved or the frequency for any given year. Surely Defendant has records of such shipments and the specific shipments, dates and parts invoiced.

[2] The existence of 150 shipments should establish general jurisdiction under the D.C. Code §13-334. If this is the case, we need go no further since general jurisdiction automatically subjects Defendant to suit, as the Defendant at p. 6-8 of its brief all but concedes. Fifteen instances per year for ten years are not isolated but a pattern of continuous and systematic contact with the forum. Without the ability to obtain discovery on the issue, Plaintiff cannot test Defendant's self serving statements; nevertheless assuming the shipment of industrial valves directly to the District with such admitted frequency proves to be true, surely the Defendant is not taking any significant steps to avoid the District of Columbia as a place to transact business; and surely any problems with the valves at the job site would render the manufacturer, distributor and craftsmen installing the valves in the District all subject to suit.

specific valves in question through a regional distributor, Noland Company in Falls Church, Virginia, and Silver Spring, Maryland. Both Falls Church and Silver Spring are Washington D.C. suburbs. Falls Church is less than four miles from the District, while Silver Spring adjoins the District itself.  See Affidavit of Vicky Goldsman, Exhibit 2.

Third, as the Affidavit of Vicky Goldsman states, valves were installed in the District of Columbia causing very real and discernable injury in this forum for which Plaintiff could be held liable. To avoid the result, Plaintiff will have to replace and repair several thousand valves installed in the District itself. There should be little doubt that if the Plaintiff can be sued in the District it would have the right to name the Defendant in that action as a joint tortfeaser, source of indemnification, or a third party Defendant.[3]

Fourth, it is clear that the Defendant has taken no action to limit or curtail the use of their nationally distributed products in this forum.  Defendant's actions as a national distributor served to place its valves into the stream of commerce. Defendant had knowledge that its products would be sold and used throughout the United States. The central issue then is the level of the Defendant's knowledge that its products would be utilized in the District of Columbia and whether the Defendant would receive economic benefit from such use. In re Baan Co. Securities Litigation, 81 F. Supp. 2d 75, 77 (D. D.C. 2000).

Defendant freely and proudly distributes a manufactured product for use in dwellings into the national stream of commerce. They have regional managers in the states adjoining the District.

---

[3] The Federal Rules of Civil Procedure both call for and allow compulsory joinder of such claims. See F.R.C.P. 19.

Fifth, given the unusual political configuration of the District, the gravity of population in the metropolitan area, which as any commuter knows clearly spills into northern Virginia and southern Maryland, the small size of its residential population, and the fact that distributors of household and commercial products favor the cheaper land and rent costs of the surrounding suburbs, it is not unusual for companies marketing and delivering products for use in the District to have no direct business operations in the District itself. In the twenty first century where transportation, environmental initiatives, sales regions, advertising markets and even sports allegiances are described in terms of the Washington D.C. metropolitan region, not merely the boundaries of the District of Columbia, a corporation that conducts business in that region can clearly expect to be haled into court in the District.

Further, what Defendant ignores is that at least one valve has presently failed in the District of Columbia. Even this single act can establish jurisdiction. Mitchell Energy Corp. v. May Helen Coal Co., Inc., 524 F. Supp. 558 (D.D.C. 1981); Manifold v. Wolf Coach, Inc., 231 F. Supp. 2d 58 (D.D.C. 2002); Material Supply International, Inc. v. Sunmatch Industrial Co., Ltd., 62 F. Supp 2d 13 (D.D.C. 1999).

Nevertheless, assuming the single act is insufficient, other indicies of jurisdictional contact may exist. However, without the benefit of discovery on the issue, Plaintiff cannot know whether Defendant has advertised directly in the District, Jackson v. Loews Washington Cinemas, Inc., (2008 WL 793617 (D.D.C. 2008); or made telephone calls or mailings, Dooley v. United Technologies Corp., 786 F. Supp. 65 (D.D.C. 1992); nor can Plaintiff test whether Defendant's claim that it had no direct contacts on its own right; or that if Defendant did engage in business in the District of

Columbia, it did so at the request of distributors and thus did not "purposely avail" itself of the forum through its own acts.

This latter point is crucial to Defendant's argument. Defendant goes to great length to cite case law and argument on the issue that the Defendant itself did not engage in conduct that amounts to direct contact. *See*, Defendant's brief at p. 12-13. However, neither the Court nor Plaintiff should be forced to uncritically accept Defendant's own pronouncements on the issue of how significant its contacts were in this forum; nor should Plaintiff simply acquiesce to an argument that the at least 150 acknowledged contacts with this forum were either a minimal source of revenue as Defendants claim or all done at the behest of unnamed distributors. In instances where such claims were made, the District of Columbia's federal courts have routinely and properly ordered discovery on the scope, breadth and nature of defendant's connection to the forum; and a failure to do so is an abuse of judicial discretion. In re Baan Securities, 81 F. Supp. 75, 82 (D.D.C. 2000); quoting Edmond v. U.S. Postal Service, 949 F.2d 424 (C.A. D.C. 1991).

Without such discovery the Plaintiff is also at a profound disadvantage of establishing at least two of the three other applicable bases for establishing personal jurisdiction; that is, whether the Defendant ever contracted to supply services in the District of Columbia itself, §13-423 (a)(2); or whether any tortious act occurred in the District as a result of an act or omission in the District itself by the Defendant.

Nevertheless, it is clear that contrary to Defendant's claims, jurisdiction lies under §13-423 (a)(4) in that there has been a tortious injury here in the District due to the defective design or manufacture of Defendant's valves. *See,* Affidavit of Vicky Goldsman, ¶7.

Defendant's analysis which cites <u>Formica v. Cascade Candle Company</u>, 125 F. Supp. 2d 552 (D.D.C 2001) is inapposite . In <u>Cascade</u>, a national distributor of candle products was sued in the District by a Maryland resident injured in Maryland by a product purchased by the resident in the District of Columbia. However, As this very court said in <u>Cascade</u>, the distinguishing issue was not simply that the Defendant had no significant contacts within the District of Columbia, but that the injury complained of had occurred in Maryland. The only link then to the District in <u>Cascade</u> was the fact that Plaintiff had <u>purchased</u> the product in the District. In the instant case, the Plaintiff purchased the product in an adjoining state for actual use in the District of Columbia itself. Indeed, the use of the product is quintessentially connected to the forum because the valve in question is not some portable object as a candle but meant to be a fixture on a piping system in a commercial business or residence. Tortious injury has and will occur in the District if Plaintiff's belief, supported by expert analysis, is correct. That is, hot water valve control mechanisms will fracture, water will spew out at perhaps high temperatures underneath sinks and near hot water heaters, and residents and business people will suffer property damage and even serious bodily injury as a result. Clearly, District residents would have the right to sue Plaintiff and Defendant when and if the product fails. To quote the Defendant itself, the District has a "manifest interest" in providing a forum to seek relief against Defendant since Defendant's product is installed in homes and businesses here, by not only craftsmen but by residents themselves.

Further, where there is actual tortious injury in the District itself from a defective product, the stream of commerce analysis used for the "transacting business" prong of §13-423 is inapplicable. Indeed, in the case where the act and injury occurred in the

District (that is, the defective product produces actual injury in the District forum), jurisdiction will be found. <u>Burnam v. Phoenix Worldwide Industries, Inc.</u>, 437 F. Supp. 2d 142 (D. D.C. 2006) (holding that defective products tend to warrant a greater exercise of jurisdiction than negligent services).

Defendant's arguments about the extent of revenue received or volume of transactions which occurred to the relevant of minimum contacts analysis, misses the mark. While clearly reference to the number of transactions and the extent of revenue they produce is relevant to establishing the existence of minimum contacts, the converse is not necessarily true. The fact that a national distributor acquires a small percentage of its revenue from transactions in the District, does not mean it cannot be held to have purposely availed itself in the District. The existence of $25,000, $50,000 OR $100,000 in revenue from transacting business in the District may be sufficient to establish jurisdiction whether it constitutes 10% of a corporation's business or .01%. It is the nature of the contact itself, not the size of the corporate entity, that determines whether jurisdiction may attach. <u>Gatewood v. Fiat</u>, S. p.A., 617 F.2d 820 (C.A. D.C. 1980); <u>Masterson-Cook v. Criss Bros. Iron Works, Inc.</u>, 722 F. Supp. 810 (D. D.C. 1971).

Personal jurisdiction in this matter clearly exists over this defendant. The Defendant is a valve manufacturer that has a national distribution chain, and by its own admission has shipped products into the District. One of the Defendant's products is defective and is failing throughout the metropolitan region, including in the District of Columbia. Whether the specific valve Defendant admits to shipping into the District is failing is not as Defendant suggests, a central issue. Jurisdiction cannot be limited to certain products, but takes into account the overall connections to the forum. A

defendant, through its business operations and conduct, either has sufficient contacts with the forum to authorize suit or it does not.

## II. A Request for Declaratory Judgment is Appropriate.

Assuming jurisdiction exists, Defendant takes exception to Count VI of the Complaint which seeks declaratory judgment by claiming that there is no case in controversy that would allow the Court to render a judgment that holds a product's designer and manufacturer liable as a contributor or indemnifier for any damages or claims brought against the installer of the product. Defendant spends considerable time arguing cases based on insurance contracts to allege that there is no justiciable claim here because no injury or claim has yet arisen. Defendant claims the Court is being requested to render an advisory opinion on a matter not before it.

Defendant again ignores one simple truth: its valves are failing in a manner that is consistent with either a design flaw, a manufacturing defect, or both; and these failures have and will occur in the District. To insure the proper safety and protection of the consumer, the defective valves will all have to be replaced. Neither the installer nor the manufacturer can or should take the risk that the failures to date are insignificant or can be ignored.

An actual, definable, justiciable controversy exists; and based on the law of products liability, a Court can determine the respective rights of the parties. National R.R. Passenger Corp. v. Consolidated Rail Corp., 670, F. Supp. 424, 427 (D. DC. 1987). 28 U.S.C. §2201(a).

A declaratory judgment on the issue of respective liability would certainly inure to the benefit of both the current litigants and future plaintiffs by determining the legal

liability of plaintiff and defendant to claims arising from defective design, manufacture or installation. Id. (Declaratory judgment act is designed to narrow issues, speed resolution and settle controversy.)  Otherwise, for each defective valve, Plaintiff will need to sue Defendant as it has done here with the prospect of varying adjudications and the misdirection of resources in each individual action. This is precisely what the Declaratory Judgment Act was meant to avoid, collateral and redundant issues on a point that the Court can determine. There is a definite and concrete controversy at this time that is whether Defendant has produced and distributed a defective product or whether that product is merely being improperly installed. If the former, the Defendant is liable; if the latter, the Plaintiff is liable for any injury or harm and for any cost or replacement. A determination on the issue would accord relief to the parties and a resolution of many of their claims. Id.

This is not a "harmless empty shadow" of a dispute. Poe v. Ullman, 367, U.S. 479, reh'g denied; 368 U.S. 869 (1961), but a very real and pertinent issue. Plaintiff is a small business that will be bankrupted if it needs to expend its own labor to replace over 13,000 valves due to design or manufacturing defects. Legally, Plaintiff should not bear that burden if fault lies with the Defendant.

There are no hypothetical facts here. An expert reviewing the valve has determined it is poorly designed and valves are failing. It would be counterintuitive and place the citizens of the District at risk without hope of correction or recovery from a known defect if the Court does not act.

As with National Railroad, this is a matter of public policy. Id., at 428.  We need not wait until citizens are scalded, property destroyed or more valves break to determine

whether a design or manufacturing flaw significant enough to require replacement of the valves exists.

Plaintiff's declaratory judgment request seeks to have the Court determine the extent of its respective liability. The fact that there is a very real possibility of suits in the future is only one part of this puzzle. Plaintiff is concerned right now about being able to replace a defective product before someone is seriously injured. Adjudication of the issue of liability will narrow the issues, bring order to the litigation, assist the parties, support public policy and provide relief to the Plaintiff. It will also in all likelihood trigger remedial action on the replacement of the valves themselves or cause the Defendant to determine the nature, extent and damages posed by the defective valves. *See,* National Railroad, supra, at 427-433.

### III.    Fraud and Deceit are Properly Plead.

Defendant also challenges Count VII, the fraud and deceit claims, based on a lack of specificity. While there is clearly an element of appropriate scienter for any valve ruptures that follow the Plaintiff notifying Defendant of the defects, Plaintiff concedes that the question of fraud and deceit are plead largely on information and belief. Given the nature of the claims and this action, proof of fraud and deceit must await discovery. However, it is Plaintiff's position that Defendant could not have had these valves properly tested as Defendant maintains in its literature accompanying the product; that is, Underwriter's Laboratories, the American National Institute of Standards and other industry quality control groups simply did or could not have tested the valves as Defendant claims or else they certainly would have discovered the inherent defects in the product. See ¶7 of Plaintiff's Complaint and Exhibit 3.

If this is true, as Plaintiff believes, there are indeed sufficient facts to base a factual claim based on knowing misrepresentations of essential facts regarding the product. Since this is sufficient at the pleading stage, Count VII should not be dismissed.

### IV.  Plaintiff is a Consumer
### Within the Meaning of the Consumer Protections.

Contrary to Defendant's claims, Plaintiff is a consumer and the transaction in question involves consumer goods. Plaintiff is a company that services among other things, plumbing within the home. Plaintiff is not a reseller or distributor of valves, does not market, advertise or trade specific brands and is not compensated in any manner for the sale or use of a specific valve other than for its labor and the cost of the parts. In other words, Plaintiff merely acts like a knowledgeable consumer who places a product in a home.

Where the injury at issue arises from an act occurring in the District of Columbia, personal jurisdiction exists. Aiken v. Lustine Chevrolet, Inc., 392 F. Supp. 883 (D.D.C. 1975) (damage to credit rating, emotional and mental well being of District resident by tort committed in Maryland).

Defendant cites Potomac Plaza Terraces, Inc. v. QSA Products, Inc., 868 F. Supp. 346 (D. D.C. 1994) as persuasive authority. Potomac Plaza dealt with a commercial contract by Potomac with a roofing company and the use by the roofing company of polyurethane foam as a sealant. When leaks developed, Potomac, a housing cooperative, sued QSC Products, the manufacturer of the roofing materials under a products liability claim. QSC defended saying it had not violated an implied warranty if merchantability because of certain written disclaimers it had with respect to the roofing materials.

Judge Harris determined that for purposes of an action brought on a commercial contract for the sale of goods, that the consumer goods exception contained in D.C. Codes §28:2-316, prohibiting declination of implied warranties of merchantability, was not applicable.

The situation is not analogous to this case. Plaintiff did not purchase materials under a commercial contract; and, thus, the issue of contractual waiver is not extent. Plaintiff purchased the valves simply as a consumer; that is to say "a person who does or would purchase, lease (from) or receive consumer goods or services … or who does or would provide the economic demand for a trade practice; as an adjective consumer describes anything without exception which is primarily for personal, household or family use." D. C. Code §28-3901(a)(1)(2).

Defendant fails to explain why a hot water valve installed in a home is not used primarily for household use. Indeed, unlike roofing material, the consumer uses the valve to manually shut water flow on or off. The valve is no different than the spigot on the kitchen sink or those in a shower. If a consumer goes to a store and purchases a hot water heater, it is clearly a consumer good. The piping that goes to the heater and its control mechanisms are no less consumer goods.

The installer of the piping to home systems is a consumer. Otherwise, there will be an incongruous result that an individual purchasing a product in a store for home installation is a consumer, while a tradesman purchasing ten such products for use in a home is not. Potomac Plaza did not create such a result nor did it limit the breadth and scope of the Consumer Protection Act, which was never mentioned or considered in the opinion.

The Consumer Protection Act is a comprehensive remedial statute to be construed broadly. District Cablevision, Ltd. Partnership v. Bassin, 828 A.2d 714 (D. D.C. 2003). Nothing in the language of the act or in any case yet considered would prohibit Quality from consideration as a consumer using consumer goods. Thus, Defendant's attempt to narrow the Act should be rejected.

### Conclusion

Personal jurisdiction exists to allow Defendant to be haled into the District of Columbia for suit. Plaintiff has properly pled its consumer protection and fraud and deceit claims so as to allow time to proceed; and Plaintiff's request for declaratory judgment is appropriate on the issue of liability and contribution.

Respectfully submitted,

QUALITY AIR SERVICES, LLC
*Plaintiff by Counsel*

GRAD, LOGAN and KLEWANS, P.C.

_____/s/ K. Byrnes_____
Kevin Byrnes, Esq., DC Bar #480195
3141 Fairview Park Drive, Suite 350
Falls Church, VA 22042
Firm Telephone: 703-548-8400
Direct Line: 703-535-5393
Facsimile: 703-836-6289
Email: kbyrnes@glklawyers.com
*Counsel for Plaintiff*

16

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on this 30th day of June, 2008, a true copy of the foregoing Plaintiff's Opposition to Defendant's Motion to Dismiss was delivered by filing and entering the same upon the electronic court filing website of the United States District Court of the District of Columbia, to the attention of Defendant's counsel, as follows:

Jeffrey C. Seaman, Esq.
Whiteford, Taylor & Preston, LLP
1025 Connecticut Avenue, N.W., Suite 400
Washington, DC 20036
Telephone: 202-659-6800
Facsimile: 202-331-0573
*Counsel for Defendant*

                   _____/s/ K. Byrnes_____
                   Kevin Byrnes, Esq., DC Bar #480195
                   GRAD, LOGAN and KLEWANS, P.C.
                   3141 Fairview Park Drive, Suite 350
                   Falls Church, VA 22042
                   Firm Telephone: 703-548-8400
                   Direct Line:  703-535-5393
                   Facsimile: 703-836-6289
                   Email: kbyrnes@glklawyers.com
                   *Counsel for Plaintiff*








Home    Job Opportunities    Contact Us    Sales    Company Profile

### Products

New Products

Product Search

Commercial Bronze Gate
Globe and Check Valves

Commercial/Industrial Iron
Gate Globe and Check Valves

Industrial Cast Steel Gate
Globe and Check Valves

Commercial Ball Valves

Industrial Ball Valves

Commercial & Industrial Iron
Butterfly Valves

Butterball SloClose and Fire
Protection Valves

High Performance Butterfly
Valves

Dry-Bulk Transport Valves

Actuation & Controls

Competitor Cross Reference

Engineering

Configurator

Request a Quote

Create a Product Submittal

Literature Request

Price Lists

Terms & Conditions

Milwaukee Valve Company has made a commitment to being the best, most responsive valve supplier in the industry, a commitment to quality and service that started over 100 years ago. From concept, through engineering, manufacturing, installation and service, every valve reflects the Company's customer commitment.



Milwaukee Valve Company was established in 1901 to manufacture valves for the plumbing and heating industries. Herschel Seder purchased the business in 1959, with his late partner, Max Koenigsberg. Due to the leadership of the Seder family, the company has come to be recognized as the industry innovator through multi-million dollar investments in training, state-of-the-art equipment, new facilities and new products.

Milwaukee Valve Company is your source for valves and actuated controls that meet all of your process-automation needs. You can specify valves complete with electric or pneumatic actuation, and a variety of control accessories. Today, Milwaukee Valve's ISO9001-certified facilities manufacture more than 4,000 manual and actuated valves to meet the exacting demands and rugged service conditions of the following industries:
* Chemical Processing
* Commercial Construction
* Fire Protection
* Food & Beverage
* Gas Distribution
* Iron & Steel Production
* Marine (U.S. Navy)
* Mining
* OEM applications
* Oil & Gas Transmission
* Petrochemical Production
* Petroleum Production & Refining
* Power Generation and Transformation
* Pulp & Paper
* Textiles
* U.S. Dept. Of Defense
* Water & Sewage

## Exhibit 1

     

Home    Job Opportunities    Contact Us    Sales    Company Profile

**Products**

New Products

Product Search

Commercial Bronze Gate Globe and Check Valves

Commercial/Industrial Iron Gate Globe and Check Valves

Industrial Cast Steel Gate Globe and Check Valves

Commercial Ball Valves

Industrial Ball Valves

Commercial & Industrial Iron Butterfly Valves

Butterball SloClose and Fire Protection Valves

High Performance Butterfly Valves

Dry-Bulk Transport Valves

Actuation & Controls

Competitor Cross Reference

Engineering

Configurator

Request a Quote

Create a Product Submittal

Literature Request

Price Lists

Terms & Conditions

**Milwaukee Valve Sales**

Commercial/Industrial Products || Marine & Government Products
Fire Protection & Specialty Products || Product Managers || Representatives

**Representatives**

Select your state / region for your local Milwaukee Valve Representative.



Canada

Puerto Rico

| | | | |
|---|---|---|---|
| Alabama | Indiana | Nebraska | South Carolina |
| Alaska | Iowa | Nevada | South Dakota |
| Arizona | Kansas | New Hampshire | Tennessee |
| Arkansas | Kentucky | New Jersey | Texas |
| California | Louisiana | New Mexico | Utah |
| Colorado | Maine | New York | Vermont |
| Connecticut | Maryland | North Carolina | Virginia |
| Delaware | Massachusetts | North Dakota | Washington |
| Florida | Michigan | Ohio | West Virginia |
| Georgia | Minnesota | Oklahoma | Wisconsin |
| Hawaii | Mississippi | Oregon | Wyoming |
| Idaho | Missouri | Pennsylvania | Canada |
| Illinois | Montana | Rhode Island | Puerto Rico |

Back to Top

**Commercial/Industrial Products**

Vice President of Marketing
Tom LaGuardia
Ph: 262-432-2720
Fax: 262-432-2701
E-Mail: tlaguard@milwaukeevalve.com

Vice President of Sales
Ricky Seward
Ph: 601-672-4969
Fax: 501-803-4590
E-Mail: rseward@milwaukeevalve.com

Back to Top

**Regional Managers**

Joe Myers
Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island and Vermont
Ph: 603-223-0107
Fax: 603-223-0108
E-Mail:jmyers@milwaukeevalve.com

Rob Rudman – District Manager
Upper New York
Ph: 585-813-5246
Fax: 516-333-9486
E-Mail:rrudman@milwaukeevalve.com

John Flaig
Delaware, Kentucky, Maryland, New Jersey, Ohio, Pennsylvania, Virginia and West Virginia
Ph: 856-582-9526
Fax: 856-582-9527
E-Mail:jflaig@milwaukeevalve.com

Joe Noel
Alabama, Arkansas, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and
Tennesse
Ph: 228-238-2436
Fax: 228-872-2844
E-Mail:jnoel@milwaukeevalve.com

Ryan Ohm
Illinois, Indiana, Michigan, Minnesota, North Dakota, South Dakota and Wisconsin
Ph: 708-710-3798
Fax: 219-365-8279
E-Mail:rohm@milwaukeevalve.com

Elias Rizk
Canada OEM accounts
Milwaukee, Wisconsin
Ph: 312-560-1251
Fax: 262-703-0750
E-Mail:erizk@milwaukeevalve.com

Brian Crowe
Florida
Ph: 954-850-8707
Fax: 954-435-2195
E-Mail:bcrowe@milwaukeevalve.com

Mike McKeever
Arizona, Colorado, Kansas, Missouri, New Mexico, Oklahoma, Nebraska, Wyoming, Iowa and
N-E Arkansas
Ph: 405-692-4504
Fax: 405-692-4549
E-Mail:mmckeeve@milwaukeevalve.com

Chris Tarantello
Alaska, California, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, and Washington

Ph: 530-644-0441
Fax: 703-997-6317
E-Mail:ctarante@milwaukeevalve.com

Ralph Teran
Texas
Ph: 713-299-4716
Fax: 281-894-4823
E-Mail:rteran@milwaukeevalve.com

Back to Top

**Marine & Government Products**

**Vice President – Marine Division**
Bill Booker
Ph: 804-232-1101
Fax: 804-232-7442
E-Mail:bbooker@milwaukeevalve.com

**Manager – Marine Division**
Julie Olson
Ph: 262-432-2883
Fax: 262-432-2701
E-Mail:Jolson@milwaukeevalve.com

Back to Top

**Fire Protection & Specialty Products**

Fire Protection, Dry Bulk, Electrical Apparatus, Petroleum
International Sales Manager
Jerry Radomski
Ph: 262-432-2752
Fax: 262-432-2701
E-Mail:Jradomski@milwaukeevalve.com

Back to Top

**Product Managers**

Commercial Product Lines
International Sales Manager
Jerry Radomski
Ph: 262-432-2752
Fax: 262-432-2701
E-Mail:jradomski@milwaukeevalve.com

Industrial Ball Valves, Actuation & Controls and Cast Steel Products
Brian Isaac
Ph: 262-432-2750
Fax: 262-432-2701

E–Mail:bisaac@milwaukeevalve.com

Marketing Assistant
Nancy Zinkgraf
Ph: 262–432–2753
Fax: 262–432–2701
E–Mail:nzinkgra@milwaukeevalve.com


Back to Top








MILWAUKEE VALVE

Home      Job Opportunities      Contact Us      Sales      Company Profile



Products

New Products

Product Search

Commercial Bronze Gate
Globe and Check Valves

Commercial/Industrial Iron
Gate Globe and Check Valves

Industrial Cast Steel Gate
Globe and Check Valves

Commercial Ball Valves

Industrial Ball Valves

Commercial & Industrial Iron
Butterfly Valves

Butterball SloClose and Fire
Protection Valves

High Performance Butterfly
Valves

Dry-Bulk Transport Valves

Actuation & Controls

Competitor Cross Reference

Engineering

Configurator

Request a Quote

Create a Product Submittal

Literature Request

Price Lists

Terms & Conditions

Sales Contacts for Virginia

SALES REPS

**Bon Air Pipe & Valve Co. LLC**
**Chuck Lowman**
8036 Whittington Dr
Richmond Virginia 23235
Phone: 804-560-0925
Fax:804-560-0921
E-Mail: cllowman@comcast.net

REGIONAL MANAGER

**John Flaig**
1206 Woodruff Road
Glassboro NJ 08028
Phone: 856-582-9526
Fax:856-582-9527
E-Mail: jflaig@milwaukeevalve.com

Return to Previous Page








**MILWAUKEE VALVE**

Home        Job Opportunities        Contact Us        Sales        Company Profile

### Products

New Products

Product Search

Commercial Bronze Gate
Globe and Check Valves

Commercial/Industrial Iron
Gate Globe and Check Valves

Industrial Cast Steel Gate
Globe and Check Valves

Commercial Ball Valves

Industrial Ball Valves

Commercial & Industrial Iron
Butterfly Valves

Butterball SloClose and Fire
Protection Valves

High Performance Butterfly
Valves

Dry-Bulk Transport Valves

Actuation & Controls

Competitor Cross Reference

Engineering

Configurator

Request a Quote

Create a Product Submittal

Literature Request

Price Lists

Terms & Conditions

Sales Contacts for Maryland

SALES REPS

**ROBERT O BARNARD ASSOCIATES**
**CHRIS BARNARD SR.**
P.O. BOX 35
COLUMBIA MD 21045
Phone: 410-720-0900
Fax:410-720-0904
E-Mail: cbarnardsr@yahoo.com

REGIONAL MANAGER

**John Flaig**
1206 Woodruff Road
Glassboro NJ 08028
Phone: 856-582-9526
Fax:856-582-9527
E-Mail: jflaig@milwaukeevalve.com

Return to Previous Page







Home        Job Opportunities        Contact Us      Sales      Company Profile

### Products

New Products

Product Search

Commercial Bronze Gate
Globe and Check Valves

Commercial/Industrial Iron
Gate Globe and Check Valves

Industrial Cast Steel Gate
Globe and Check Valves

Commercial Ball Valves

High Performance Butterfly
Valves

Commercial & Industrial Iron
Butterfly Valves

Plumbing and Heating Valves

Y-Strainers

Actuation & Controls

Competitor Cross Reference

Engineering

Configurator

Request a Quote

Create a Product Submittal

Literature Request

Price Lists

Terms & Conditions

Sales Contacts for Virginia



**SALES REPS**

**North of and including Shenandoah, Warren,
Rappahannock, Fauquier and Prince William
Counties
Robert O. Barnard Associates**

**Chris Barnard, Sr.**

P.O. Box 35

Columbia MD 21045

Phone: 410-720-0900

Fax:410-720-0904

E-Mail: cbarnardsr@yahoo.com

REGIONAL MANAGER

John Flaig

1206 Woodruff Road

Glassboro NJ 08028

Phone: 856-582-9526

Fax:856-582-9527

E-Mail: jflaig@hammondvalve.com

Return to Previous Page




Home    Job Opportunities    Contact Us    Sales    Company Profile

**Products**

New Products

Product Search

Commercial Bronze Gate
Clobe and Check Valves

Commercial/Industrial Iron
Gate Clobe and Check Valves

Industrial Cast Steel Gate
Globe and Check Valves

Commercial Ball Valves

High Performance Butterfly
Valves

Commercial & Industrial Iron
Butterfly Valves

Plumbing and Heating Valves

Y–Strainers

Actuation & Controls

Competitor Cross Reference

Engineering

Configurator

Request a Quote

Create a Product Submittal

Literature Request

Price Lists

Terms & Conditions

Sales Contacts for Maryland

SALES REPS

**Robert O. Barnard Associates**
**Chris Barnard, Sr.**
P.O. Box 35
Columbia MD 21045
Phone: 410–720–0900
Fax:410–720–0904
E–Mail: cbarnardsr@yahoo.com

REGIONAL MANAGER

**John Flaig**
1206 Woodruff Road
Glassboro NJ 08028
Phone: 856–582–9526
Fax:856–582–9527
E–Mail: jflaig@hammondvalve.com

Return to Previous Page



**U.S. DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| QUALITY AIR SERVICES, LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MILWAUKEE VALVE COMPANY, INC. | )    Civil Action No. 08-0690 |
| d/b/a HAMMOND VALVE COMPANY | ) |
| | ) |
| Defendant. | ) |
| | ) |

## AFFIDAVIT OF VICKY GOLDSMAN

COMES NOW your affiant, Vicky Goldsman, and makes the following affidavit under oath:

1.     My name is Vicky Goldsman.  I am the Vice President of Marketing and Sales Manager for Quality Air Services, LLC ("Quality Air").

2.     I am over the age of 18 and am competent to make this affidavit based on my own personal knowledge.

3.     Quality Air is located in Rockville, Maryland.  From late 2004 until mid-2007, Quality Air purchased about 13,320 Hammond 8911 valves manufactured by Milwaukee Valve Company, Inc.  All such valves were purchased from the Noland Company, an authorized distributor of Milwaukee Valve Company, Inc.

4.     The Noland Company has two local offices near Quality Air and near the District of Columbia, one in Falls Church , Virginia, and one in Silver Spring , Maryland.  All of the Hammond 8911 valves which Quality Air purchased were purchased from the Silver Spring office of Noland Company.

**Exhibit 2**

5.      Over the past three years or more, Quality Air has installed about 2,500 of the Hammond 8911 valves in residential condominium or rental units in the District of Columbia.  These installations occurred in about 20 different buildings in the District of Columbia.

6.      All of the Hammond 8911 valves that Quality Air has installed in these residential units are used as service valves of the individual heating and air conditioning units (also called convectors) in each residence.  Each valve can be used to turn the hot or cold water running into the convector on or off.  Each convector has two Hammond valves, and each valve is readily accessible to the user in a control panel on the front of the convector.  All of the convectors, including these Hammond 8911 valves, were installed in these residences primarily for household or family use.

7.      To date, Quality Air is aware of at least eight Hammond 8911 valve failures in the District of Columbia, Virginia, and Maryland, since we installed them over the past three years or so.  In addition, we have experienced several more Hammond valves that were already broken when their shipping containers were opened.

8.      Every such valve failure that Quality Air is aware of has occurred at the same location on the valves.  We have been advised by a certified independent testing laboratory that these failures are caused by stress corrosion cracking due to a manufacturing defect by Milwaukee Valve Company, Inc.

9.      I have enclosed with this affidavit a copy of that laboratory report dated July 30, 2007 from Clauser Engineering Consulting, Inc.

10.      We at Quality Air expected that theses valves would last at least 50 years or more, as is customary for our industry.  Because these Hammond 8911 valves are

failing prematurely at such an alarming rate and because each failure involves the possibility of large amounts of flooding, property damage, and even injury to the occupants of these residential units, we have no choice except to replace all 13,320 valves to protect the occupants of these residences and their property.

11.    We are an installer of valves not a reseller.  The valves in question are used within homes and buildings and become fixtures to the piping.

12.    After the initial valve failures, we requested that Milwaukee Valve Company, Inc. assess the quality of their valves and confirm such quality to us. Milwaukee Valve Company, Inc. ignored that request.

Further your Affiant sayeth not.

Vicky Goldsman

STATE of MD, to wit:

The foregoing Affidavit of Vicky Goldsman was sworn and subscribed to before me this 30 day of June, 2008, by Vicky Goldsman who personally appeared before me.

Given under my hand and seal this 30 day of June, 2008.

My Commission expires:

CHARLES MOUBBAZADEH
Notary Public
Montgomery County
Maryland
My Commission Expires Feb 29, 2012

Notary Public

3

# CRAIG CLAUSER  ENGINEERING CONSULTING, INC.

July 30, 2007

Mr. Donald Osborne
Ohio Casualty
P.O. Box 98
Elkton, MD   21922

RE:    Insured - Quality Air Service
          Ohio Casualty Claim No. 07021214
          File C07045

Dear Mr. Osborne:

At the direction of Michael Lutz of Rimkus Consulting Group I received two, ½ inch, ball valves that had failed in service and performed metallurgical failure analyses of the valves.

The valves are shown in Photographs 1 and 2.  One valve was labeled as being from Apartment 304 and the other, from 512 South.  Both valves carried the identification: **HAMMOND FIG. NO. 8911, 600WOG/150SWP, 1/2.**

On July 25, 2007, I examined and tested the valves at Micron, Inc. in Wilmington, DE.  The laboratory procedure was as follows:

- the valves were photographed as received;
- the fracture surfaces were examined with a stereo microscope and photographed;
- the fracture surfaces were examined with a scanning electron microscope (SEM) and photographed;
- a semi-quantitative chemical analysis was obtained of the valves on the fracture and on an adjacent machined surface utilizing an energy dispersive spectrometer (EDS) in conjunction with the SEM;
- a radial-axial sections intersecting the fractures were cut and prepared and  the microstructure was examined and photographed with a metallograph; and
- micro hardness testing was performed on the metallographic samples.

1610 HUNTER CIRCLE          PHONE (610)640-3370          CELL (484)678-3371
WEST CHESTER, PA 19380    FAX     (610)640-3361          cclauser-cceci@comcast.net

# CRAIG CLAUSER ENGINEERING CONSULTING, INC.

NAME
CAPTION
Page 2 of 11

A CD containing all of the Micron, Inc. data as well as my photographs is being provided with this report.

The failure mechanisms of both valves were the same. The fracture occurred in the last male thread of the valve end cap. Photographs 3 and 4 show the mating faces of one of the fractures. The fracture originated on the outside (air side as opposed to water side) at the thread root. The primary fracture was brittle and mostly transgranular "cleavage"-like fracture as shown in Photograph 5. The final fracture was a ductile tear between the two adjacent threads as shown in Photograph 6. Microscopically this fracture exhibited "dimpled" rupture resulting from micro void coalescence. Photograph 7 shows the transition in fracture mode.

The chemical analysis (approximately 61 % Cu, 35 % Zn, 1 % Al, 1 % Fe, 1% Sn, and 1 % Ni) and hardness testing results (approximately Rockwell $H_B$ 73) identify the valve material as a high strength, yellow brass (manganese bronze) such as CDA 865. The observed microstructure, alpha phase brass in a continuous matrix of beta phase brass is typical for this alloy. The transgranular crack propagation was noted to be through the beta phase. Photograph 8 is a typical micrograph at the fracture.

The observed fracture characteristics are uniquely those of stress corrosion cracking (SCC) of this type brass. CDA 865 and similar copper-zinc alloys are susceptible to SCC. SCC results in brittle fracture that occurs slowly over time. SCC occurs when a susceptible metal is subjected to tensile stress in a SCC inducing environment. The most common environment that cracks brass is aqueous ammonia. This environment typically develops when ammonia gas from cleaning liquids or out gassing of building material dissolves in water condensation on the metal surface.

It is foreseeable that brass components will be exposed to this type environment in service. Prevention of stress corrosion cracking requires that the tensile stress in the material be kept very low. The wall thickness of the valve in relation to its internal diameter keeps the tensile stress resulting from water pressure at a low level. One source of stress can be residual stress created during the manufacturing of the end cap. The other source of tensile stress perpendicular to these fracture surfaces is the stress that results from tightening the end cap on the valve during assembly. Since the installer, Quality Air Service, is not required to remove and reinstall the end cap, both sources of excess stress are controlled by the manufacturer, Hammond.

It is my opinion that the cause of these failures was defective manufacture of the valves which resulted in excessive stress in the end cap threads that rendered them susceptible to SCC in service. There is no evidence that any action on the part of Quality Air Service contributed to the occurrence of these failures.

# CRAIG CLAUSER ENGINEERING CONSULTING, INC.

NAME
CAPTION
Page 3 of 11


All opinions expressed in this report are to a reasonable degree of engineering certainty based on the material reviewed, my examination and testing, and my experience and training.  If you have any questions, please call.


Sincerely,

Craig D. Clauser, P.E.

## CRAIG CLAUSER    ENGINEERING CONSULTING, INC.

NAME
CAPTION
Page 4 of 11



# PHOTOGRAPH 1

## CRAIG CLAUSER ENGINEERING CONSULTING, INC.

NAME
CAPTION
Page 5 of 11



# PHOTOGRAPH 2

CRAIG CLAUSER ENGINEERING CONSULTING, INC.

NAME
CAPTION
Page 6 of 11



# PHOTOGRAPH 3

CRAIG CLAUSER ENGINEERING CONSULTING, INC.

NAME
CAPTION
Page 7 of 11



# PHOTOGRAPH  4

**CRAIG CLAUSER   ENGINEERING CONSULTING, INC.**

NAME
CAPTION
Page 8 of 11



# PHOTOGRAPH  5

## CRAIG CLAUSER ENGINEERING CONSULTING, INC.

NAME
CAPTION
Page 9 of 11



# PHOTOGRAPH 6

CRAIG CLAUSER ENGINEERING CONSULTING, INC.

NAME
CAPTION
Page 10 of 11



# PHOTOGRAPH 7

# CRAIG CLAUSER ENGINEERING CONSULTING, INC.

NAME
CAPTION
Page 11 of 11



# PHOTOGRAPH 8

# "8911"

# 1/2" - 3"

**BRASS BALL VALVE**
**TWO PIECE, FULL PORT**
**600 PSIG WOG / 150 PSIG SWP ***
**SOLDERED ENDS**

FED. SPEC. WW-V-35C  II, BZ, 3, c
MSS SP-110
ASME A112.4.14



ANSI / NSF 61
BALL VALVE
9EAO

**WATER QUALITY**

## MATERIALS LIST

| ITEM | PART | MATERIALS | ASTM/SPEC |
|------|------|-----------|-----------|
| 1 | Body | Brass, Forged | B283 |
| 2 | Tailpiece | Brass, Forged | B283 |
| 3 | Ball | CP Brass Ball | B283 |
| 4 | Ball Seal | PTFE | Commercial |
| 5 | Stem | Brass | B124 |
| 6 | O-Ring | Buna-N | D2006 |
| 7 | Thrust Washer | PTFE | Commercial |
| 8 | Gland Nut | Brass | B124 |
| 9 | Packing | PTFE | Commercial |
| 10 | Handle | Zinc Plated Steel | B633 |
| 11 | Handle Nut | Zinc Plated Steel | B633 |

## PRESSURE - TEMPERATURE CHART



**VACUUM SERVICE TO 29 INCHES Hg.**

| | | Seat Material Rating |
|---|---|---|
| | | Joint Limits from ASME B16.18 for 95/5 Solder |

| Valve Size | UNITS | 1/2" | 3/4" | 1" | 1-1/4" | 1-1/2" | 2" | 2-1/2" | 3" |
|------------|-------|------|------|-----|--------|--------|-----|--------|-----|
| A | INCHES | .50 | .76 | 1.00 | 1.26 | 1.50 | 2.00 | 2.48 | 2.95 |
| | mm | 12.7 | 19.3 | 25.0 | 32.0 | 38.1 | 51.0 | 63.0 | 74.9 |
| B | INCHES | 2.28 | 3.1 | 3.56 | 4.13 | 4.64 | 5.75 | 7.25 | 8.25 |
| | mm | 58 | 79 | 90 | 105 | 118 | 146 | 131.1 | 152.4 |
| C | INCHES | 1.14 | 1.55 | 1.78 | 2.06 | 2.32 | 2.87 | 3.62 | 4.12 |
| | mm | 29 | 39 | 45 | 52 | 59 | 73 | 92.1 | 104.7 |
| D | INCHES | 1.46 | 1.93 | 2.10 | 2.33 | 2.52 | 2.96 | 3.94 | 4.37 |
| | mm | 37 | 49 | 53 | 59 | 64 | 75 | 100.1 | 111.0 |
| E | INCHES | 3.14 | 4.35 | 4.35 | 5.00 | 5.00 | 6.90 | 7.87 | 7.87 |
| | mm | 80 | 110 | 110 | 127 | 127 | 175 | 199.9 | 199.9 |
| F | TUBE SIZE | .63 | .88 | 1.13 | 1.38 | 1.63 | 2.13 | 2.63 | 3.13 |
| Cv | | 18 | 40 | 72 | 112 | 161 | 287 | 448 | 645 |
| TORQUE | in-lb | 19 | 58 | 69 | 89 | 124 | 210 | 445 | 563 |
| | N.m | 2.1 | 6.5 | 7.8 | 10 | 14 | 24 | | |
| WEIGHT | lbs | 0.40 | 0.82 | 1.15 | 1.53 | 2.23 | 4.61 | 10.00 | 13.00 |
| | Kg | .180 | .370 | .521 | .696 | 1.012 | 2.092 | 4.54 | 5.90 |

Rev. 1

The information presented on this sheet is correct at the time of publication. Hammond Valve reserves the right to change design, and/or material specifications without notice. For the most current information access www.hammondvalve.com

BV-24    **Exhibit 3**



HAMMONDVALVE