**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **QUALITY AIR SERVICES, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MILWAUKEE VALVE COMPANY, INC. d/b/a HAMMOND VALVE COMPANY,**<br><br>**Defendant.** | ) | **Civil Action No. 08-0690 (ESH)** |

**MEMORANDUM OPINION**

Plaintiff Quality Air Services, LLC ("Quality Air") has sued defendant Milwaukee Valve Company, Inc. d/b/a Hammond Valve Company ("Hammond Valve") for damages resulting from the purchase and installation of valves it claims were defectively manufactured. Hammond Valve now moves for partial summary judgment, and for the reasons stated herein, the motion will be granted in part and denied in part.

**FACTUAL BACKGROUND**

Quality Air is a limited liability company that installs and repairs heating, ventilation, and air conditioning ("HVAC") units. (Compl. ¶ 1.) It specializes in the restoration, maintenance, and replacement of fan coil units for residential condominiums and rental units within multi-family housing buildings in the District of Columbia, Maryland, and Northern Virginia. (*Id.* ¶¶ 1-2.) Hammond Valve manufactures and sells valves used in various commercial and domestic

applications, including HVAC systems for multi-family housing buildings. (*Id.* ¶ 4.) In particular, it manufactures the Hammond 8911 valves at issue in this case.

Between late 2004 and early 2007, Quality Air purchased 13,320 Hammond 8911 valves and installed them in buildings in Maryland, Virginia, and the District of Columbia. (*Id.* ¶ 8.) Quality Air purchased the valves from the Noland Company, a wholesale distributor of mechanical equipment and supplies, which sold the product as manufactured and packaged by Hammond Valve. (*Id.* ¶ 14.) Sixteen of the valves it installed subsequently broke, resulting in leaks and flooding in the buildings in which they were placed. (*Id.* ¶ 24; *see also* Pl.'s Supp. Mem. in Opp'n to Def.'s Mot. for Partial Summ. J. ["Pl.'s Supp. Opp'n"] at 1.) As a result, in April 2008, Quality Air sued the defendant, alleging that Hammond Valve had breached express and implied warranties and had sold a defective and unreasonably dangerous product.[1] Plaintiff maintains that all of the 13,320 valves it purchased are defective in the manner in which they were manufactured. (Compl. ¶ 9.) Quality Air seeks compensatory and punitive damages, including the cost of replacing each of the 13,320 Hammond 8911 valves it installed. (*Id.* ¶¶ 25-26; Pl.'s Mem. in Opp'n to Def.'s Mot. for Partial Summ. J. ["Pl.'s Opp'n"] at 8.)

Defendant's Motion for Partial Summary Judgment seeks to bar plaintiff's claims for expenses relating to replacement of valves that have not failed. (Mem. in Supp. of Def.'s Mot. for Partial Summ. J. ["Def.'s Mem."] at 2.) Specifically, defendant argues that 1) plaintiff has

[1] Plaintiff also alleged that defendant's sale of the Hammond 8911 valves violated the Consumer Protection Act, D.C. Code § 28-3904(d)-(e), constituted fraud and deceit, and warranted a declaratory judgment holding Hammond Valve liable for all potential losses and damages suffered or incurred by Quality Air as a result of the defective valves. (Compl. ¶¶ 50-51, 55, 59.) These claims were dismissed in July 2008. (Mem. Op. & Order at 10 (July 21, 2008).) Plaintiff recently filed a motion to amend its complaint and restore its claim of fraud and deceit based on discovery disclosures. (Pl.'s Mot. for Leave to Amend the Compl. ¶ 4.) This motion has been denied without prejudice by Order issued this date.

failed to offer sufficient evidence that the installed, currently operating valves are non-conforming and/or defective, and 2) plaintiff's claims for damages based on the possibility that some or all of these valves might fail in the future are speculative. (*Id.*) Hammond Valve also argues that the plaintiff has not complied with the Court's local rules because it did not provide a statement of genuine issues of fact supported by references to specific portions of the record. (Def.'s Mem. in Reply to Opp'n to Mot. for Partial Summ. J. ["Def.'s Reply"] at 2-3.) As such, defendant contends that the Court should strike plaintiff's opposition and assume as true all facts in its own Statement of Material Facts Not in Dispute. (*Id.* at 3.) Finally, defendant contends that plaintiff's claims of express and implied breaches of warranty are barred because plaintiff failed to notify the defendant within a "reasonable" time that it considered the installed and still-operating Hammond 8911 valves to be non-conforming. (*Id.* at 17-18.)

## ANALYSIS

### I. LEGAL STANDARD

A motion for summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). There is a "genuine issue" of material fact if a "reasonable jury could return a verdict for the nonmoving party." *Galvin v. Eli Lily & Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting *Anderson*, 477 U.S. at 248). A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Hunt v. DePuy Orthopaedics, Inc.*, 636 F. Supp. 2d 23, 25-26 (D.D.C. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

By pointing to the absence of evidence to support the nonmoving party's case, a moving party may succeed on summary judgment. *Celotex*, 477 U.S. at 325. A nonmoving party may not rely solely on allegations or conclusory statements, but must present "specific facts that would enable a jury to find in its favor." *Felton v. Haris Design & Const. Co.*, 417 F. Supp. 2d 17, 21 (D.D.C. 2006).

**II. SUFFICIENCY OF PLAINTIFF'S OPPOSITION**

Hammond Valve argues in its reply that Quality Air failed to provide a statement of genuine issues of fact with references to the record and that the Court should therefore strike Quality Air's opposition and assume as true the facts in Hammond Valve's statement of facts. (Def.'s Reply at 3.) The local rules provide that an opposition to a motion for summary judgment "shall be accompanied by a separate, concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." Local Civ. R. 7(h). This rule exists to "assist[] the district court to maintain docket control and to decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996). Rule 7 "places the burden on the parties to focus the court's attention on the salient factual issues in what otherwise may amount to a mountain of exhibits and other materials." *Id.* at 153.

While failure to file a proper statement of facts under this rule "may be fatal to the delinquent party's position," *id.* at 151 (internal quotation marks omitted), the Court declines to strike plaintiff's opposition on this ground. Although Quality Air's Statement of Material Facts in Dispute does not reference the record, plaintiff's memorandum in opposition includes extensive citations to various exhibits and deposition testimony. (*See, e.g.*, Pl.'s Opp'n at 10-19,

20-21.) As such, plaintiff effectively "isolate[d] the facts that the parties assert are material, distinguishe[d] disputed from undisputed facts, and identifie[d] the pertinent parts of the record." *Jackson*, 101 F.3d at 151. The Court therefore finds it unnecessary to invoke the drastic step of treating the issues in defendant's motion as conceded. *See Burke v. Gould*, 286 F.3d 513, 518 (D.C. Cir. 2002) ("[T]he court has cautioned, in view of the severity of dismissal of a potentially meritorious claim, that treating an issue as conceded for failure to respond fully to a motion for summary judgment 'should only be applied to egregious conduct.'")

## III. BREACH AND DAMAGES UNDER THE UNIFORM COMMERCIAL CODE

Defendant's primary argument is that plaintiff is not entitled to future damages (*i.e.*, the cost of replacing valves that have not actually broken) because it has not "establish[ed] that those damages are reasonably certain to occur." (Def.'s Mem. at 2.) Plaintiff maintains that all of the valves it purchased from defendant "have already 'failed' because they are non-conforming goods under the Uniform Commercial Code." (Pl.'s Opp'n at 9.) Essentially, Quality Air contends that the Hammond 8911 valves it purchased did not comply with express warranties, the implied warranty of merchantability, and the implied warranty of fitness for a particular purpose because they contain manufacturing defects. (Compl. ¶¶ 28-29, 34, 39; Pl.'s Opp'n at 19). Its position is that the alleged defects in the valves rendered them non-conforming as soon as Quality Air purchased them, meaning that under District of Columbia Official Code ("D.C. Code"), Quality Air is entitled to damages now, even though the vast majority of the valves have not broken. (Pl.'s Opp'n at 9, 20.) It argues that the only reasonable remedy for defendant's breach of the warranties (*i.e.*, supplying plaintiff with non-conforming goods) is to "tak[e the defective valves] out of service and replac[e] them with conforming goods." (*Id.* at 20.) Defendant responds that plaintiff has failed to demonstrate that the installed valves that have not

broken do not conform to warranty terms, as those valves continue "to serve the purposes to which the Plaintiff put them." (Def.'s Reply at 4.) As such, defendant maintains that plaintiff has not proven any "damages proximately caused" by the still-functioning valves and therefore, any such damages are merely speculative. (*Id.* at 12.)

### A. The Uniform Commercial Code

The Uniform Commercial Code ("UCC"), codified in the District of Columbia[2] in sections 28:1-101 through 28:11-108 of the D.C. Code, details the origins and applicability of express and implied warranties. Express warranties by the seller are created as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

D.C. Code § 28:2-313(1) (2001). Further, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." *Id.* § 28:2-314(1). And finally, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the

[2] As this case is before the Court pursuant to diversity jurisdiction, the law of the District of Columbia shall govern all substantive issues. *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995); *see also Schleier v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, 876 F.2d 174, 180 (D.C. Cir. 1989) ("Although the Rules of Decision Act, and hence *Erie Railroad v. Tompkins*, do not strictly apply with respect to D.C. law, we apply D.C.'s substantive law analogously for reasons of uniformity and respect for the D.C. Court of Appeals.") (citation omitted).

seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." *Id.* § 28:2-315.

If a seller breaches one or more of these warranties, a buyer who has accepted the goods and given notification "may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." *Id.* § 28:2-714(1); *see also id.* § 28:2-607(3) (buyer must notify seller of breach within reasonable time). "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." D.C. Code § 28:2-714(2). A buyer may also recover incidental and consequential damages resulting from seller's breach, including "any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." *Id.* § 28:2-715(1)-(2). As noted, the issue before the Court in deciding this motion is not damages resulting from "injury to person or property proximately resulting from any breach of warranty." *Id.* § 28:2-715(2)(b). Rather, plaintiff seeks damages for breach of warranty for valves that have not yet broken.

**B. Applicable Warranties**

The parties dispute exactly which warranties applied to the Hammond 8911 valves. Quality Air maintains that Hammond Valve breached the following express warranties: 1) that the valves were fit for the particular purpose utilized; 2) that the valves were certified to comply with Underwriters Laboratories ("UL") and ANSI standards; and 3) that the valves were designed and manufactured to withstand 600 pounds per square inch ("PSI") of water pressure at

temperatures up to 250 degrees Fahrenheit. (Compl. ¶ 28.) Regarding UL and ANSI standards, plaintiff argues that defendant expressly warranted the valves as complying with the "ANSI/ASTM standards for brass." (Pl.'s Opp'n at 19.) Defendant does not contest for purposes of its motion that the Hammond 8911 valves were "proper for the sort of use for which it was employed by Plaintiff," and it concedes that it represented that the Hammond 8911 valve "is designed to withstand up to 600 pounds of pressure at 250 [degrees]." (Def.'s Reply at 6-7). However, with respect to UL and ANSI certification, Hammond Valve argues that "UL . . . certified that the water passing through the valve is safe for drinking" and that the valve was designed to meet ANSI/NSF 61, which "pertains to water quality." (*Id.* at 6.) As for implied warranties, defendant does not dispute plaintiff's allegation that an implied warranty of merchantability applies to the valves. (*Id.* at 11.) However, it challenges plaintiff's claim that there existed an implied warranty of fitness for a particular purpose. (*Id.*) Defendant argues that there is no evidence that plaintiff "in any way relied upon the Defendant in selecting the valves" and that such reliance is required in order for such a warranty to arise. (*Id.* at 12); *see also* D.C. Code § 28:2-315.

Despite the arguments in defendant's reply, the focus of the instant motion is not on which warranties apply to the Hammond 8911 valves, but rather, whether plaintiff may recover damages under any warranty or negligence theory for valves that did not break. As such, the Court need not decide at this time which express warranties applied to the Hammond 8911 valves and will accept for purposes of deciding the instant motion that defendant expressly warranted the valves regarding water quality and/or brass standards. However, the Court finds that as a matter of law, an implied warranty of fitness for a particular purpose is not applicable in this case because there is no evidence of any direct dealing between Hammond Valve and

Quality Air.[3] A seller's knowledge of a buyer's particular purpose and its reliance on the expertise of the seller is a necessary element of an implied warranty of fitness for a particular purpose. D.C. Code § 28:2-315. For this reason, it is settled law that "[t]he need to establish specific knowledge on the part of the seller often may create a near requirement of direct dealing, if not actual privity." *Ford Motor Co. v. Gen. Accident Ins. Co.*, 779 A.2d 321, 343-44 (Md. 2001). As such, "[t]he warranty of fitness theory is usually not available against a remote manufacturer, who would have no reason to know of any special use[4] to which the buyer would put the goods[.]" *Id.* (quoting Barkley Clark & Christopher Smith, *The Law of Product Warranties* ¶ 5.01[2][a], 5-9 (1984)).[5] Here, both parties agree that Norland Company sold the Hammond 8911 valves to plaintiff, and there is no evidence to suggest that the parties had any dealings prior to or concurrent with Quality Air's purchase of the valves. Therefore, an implied warranty of fitness for a particular purpose does not apply, and plaintiff may only seek damages for its claim of breach of implied warranty of merchantability.

---

[3] Quality Air states in its complaint that it purchased the Hammond 8911 valves from the Noland Company, an authorized distributor of Hammond valves. (Compl. ¶ 14.) Hammond Valve confirms that it sold the valves "through an independent distributor in Maryland." (Def.'s Statement of Material Facts Not in Dispute in Support of Mot. for Partial Summ. J. ¶ 2.)

[4] Even where the purpose of the buyer is not "special" but is the same as the ordinary purpose for which the product is used, a plaintiff must still demonstrate that the seller knew that the buyer was relying on its skill and judgment. D.C. Code. § 28:2-315.

[5] Although in some situations, a manufacturer may be held to the implied warranty of fitness for a particular purpose, these cases involve direct dealings between the manufacturer and the buyer such that the manufacturer becomes, in effect, the seller. *See, e.g.*, *Chrysler Corp. v. Miller*, 310 So. 2d 356, 357 (Fla. Dist. Ct. App. 1975) (implied warranty of fitness for particular purpose applied to manufacturer where plaintiff contacted president of manufacturer directly and president recommended to plaintiff goods it should use).

### C. Cognizable Damages Under the UCC

With respect to both express and implied warranties, the issue before the Court is "whether a plaintiff can make a valid warranty claim for a product *that has not actually failed to perform*." (Def.'s Reply at 8.) That is, can a plaintiff incur damages under the UCC when it receives an allegedly defective product but the product has not failed to perform as intended?

Hammond Valve argues that this question was answered by *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982). *Feinstein* involved a series of failures of Firestone-manufactured tires that resulted in various government reports and ultimately a voluntary recall by Firestone. *Id.* at 597. Three actions were filed against Firestone in which plaintiffs sought to certify classes of persons and entities who had owned or purchased the tires during the relevant time period. *Id.* at 598-600. These potential classes included purchasers and owners of tires that "had led full and uneventful lives"—that is, tires that "remained failure free throughout the time they were used, meeting or exceeding the maximum express treadwear mileage guarantee of 40,000 miles." *Id.* at 601. The court concluded that because the tires had "lived full, productive lives," they were "fit for the ordinary purposes for which they were used" and "merchantable." *Id.* at 602. As such, the purchasers and owners of such tires had not suffered any damages, and therefore had no cause of action for a breach of an implied warranty of merchantability under UCC section 2-314.[6] *Id.* The court summarized its holding as follows:

> The case at bar does not turn on the adequacy of plaintiffs' pleading, but rather upon the actual performance of Firestone's tires, as revealed by the record developed between filing the

[6] The court in *Feinstein* cited comment 13 to UCC § 2-314, which observes that "[i]n an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained. *Feinstein*, 535 F. Supp. at 602 (quoting UCC § 2-314 cmt. 13); *see also* D.C. Code § 28:2-314 cmt. 13. The case did not involve express warranties or an implied warranty of fitness for a particular purpose.

> complaint and moving for certification. The majority of the tires sold to putative class members, by doing what they were supposed to do for as long as they were supposed to do it, clearly lived up to that "minimum level of quality" which is all U.C.C. [§] 2-314(2)(c) requires. Thus no claim for breach of an implied warranty is maintainable in respect of such tires. Plaintiffs' bald assertion that a "common" defect which never manifests itself "ipso facto caused economic loss" and breach of implied warranty is simply not the law.

*Id.*; *see also Am. Suzuki Motor Corp. v. Superior Court*, 44 Cal. Rptr. 2d 526, 531 (Ct. App. 1995) ("Because the vast majority of the [goods] sold . . . did what they were supposed to do for as long as they were supposed to do it, we conclude that these vehicles remained fit for their ordinary purpose.") (internal quotation omitted).

Hammond Valve argues that the reasoning in *Feinstein*, which has been cited with approval by this Court and others, governs the instant case and requires dismissal of plaintiff's claims for damages based on valves that have not broken. (Def.'s Reply at 8-10.) *See also Barbarin v. General Motors Corp.*, No. 84-0888, 1993 WL 765821, at *2 (D.D.C. Sept. 22, 1993) (dismissing claims under Magnuson-Moss Act and for breach of express and implied warranties where plaintiff's automobiles never failed). Yet, other courts have adopted a different approach to the issue of when a plaintiff incurs damages for allegedly defective goods under the UCC.[7] One case in particular, *Hicks v. Kaufman and Broad Home Corporation*, is analogous to this case. In *Hicks*, plaintiffs brought claims, including breach of express and implied

---

[7] *See, e.g.*, *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1100 (S.D. Ind. 2001) (to state claim, plaintiffs need not demonstrate injury as result of breach, only that they purchased unmerchantable product); *Hicks v. Kaufman & Broad Home Corp.*, 107 Cal. Rptr. 2d 761, 768 (Ct. App. 2001) (where products had not yet failed but were "substantially certain" to, buyers had stated breach of warranty claims); *Anthony v. Gen. Motors Corp.*, 109 Cal. Rptr. 254 (Ct. App. 1973) (class certification permitted where complaint alleged that all products contained inherent defect which may cause them to fail at some time); *Microsoft Corp. v. Manning*, 914 S.W.2d 602, 608-09 (Tex. App. 1995) (affirming certification of class where plaintiffs' goods had not failed but lifespan of goods was indefinite), *abrograted on other grounds by Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430 (Tex. 2007).

warranties, against a construction company for installing "inherently defective" concrete slab foundations under their homes. *Hicks*, 107 Cal. Rptr. 2d at 764. The slabs were made with polypropylene instead of wire mesh, and the polypropylene failed to prevent the spreading of cracks caused by loss of moisture and other occurrences, as wire mesh would have done. *Id.* Many of the slabs at issue had not actually cracked at the time the lawsuit was brought, but plaintiffs' expert testified that future cracks were "likely." *Id.* at 768. The defendant in *Hicks* maintained that the owners of slabs that had not yet cracked and were thus "performing" did not have a cause of action for breach of warranty. *Id.* The court disagreed, finding that the right alleged by plaintiffs to have been violated "was the right to take a product free from defect," and that the defect *itself* was the injury, not further injury caused by the defect. *Id.* at 771-72. As such, the *Hicks* court concluded that "proof of breach of warranty does not require proof the product has malfunctioned but only that it contains an inherent defect which is substantially certain to result in malfunction during the useful life of the product." *Id.* at 768. The court distinguished *Feinstein* by noting that that case was "not decided on the ground that a defect must have resulted in the product malfunctioning in order to give rise to a suit for breach of warranty." *Id.* at 772. "Rather, [it was] decided on the ground that since there was no history of the products failing they were not, as a matter of law, defective." *Id.* The court found that concrete foundations were different from the tires at issue in *Feinstein*, as tires have a "limited useful life." *Id.* By contrast, it found that "[a] foundation's useful life . . . is indefinite." *Id.* Moreover, the plaintiffs in *Hicks* had presented evidence that the polypropylene slabs would "someday most likely crack badly" and cause extensive property damage, *because* of the defect in their manufacture (*i.e.*, because they were made with polypropylene and not wire mesh). *Id.* at

773. Such evidence had not been presented in *Feinstein*, where many of the tires at issue had been used without incident for their entire "lives."

The Court finds that the Hammond 8911 valves are more like the foundations in *Hicks* than the tires in *Feinstein*. Quality Air alleges that the valves have an "expected life of 50-60 years" (Compl. ¶ 25), and the record contains expert testimony that the "expected service life of one of these ball valves before corrosion failure should be somewhere between 35 and 55 years." (Def.'s Mem., Ex. G at 7; *see also* Pl.'s Mot. Ex. 4, at 10) The first Hammond 8911 valves purchased by Quality Air were installed in late 2004, meaning that the longest any of the valves has been in service is five years. (Compl. ¶ 8.) As such, the valves should have at least another thirty, and possibly fifty, years of "useful life." If plaintiff were to establish that the Hammond 8911 valves are defective, even if they have not yet failed, it could show that defendant breached the implied warranty of merchantability with respect to still-functioning valves. Plaintiff could also state a valid claim for breach of express warranties concerning installed valves if it can prove that those valves, despite their apparent functionality, do not conform to defendant's promised specifications.

**D. Plaintiff's Implied Warranty of Merchantability Claim**

The Court finds that plaintiff has presented sufficient evidence to permit a jury to conclude that the valves were unfit for their ordinary purpose of carrying water under high pressure at high temperatures. The issue here is whether plaintiff has received a product that is "free from defect," not what damages might result from that defect. *Hicks*, 107 Cal. Rptr. 2d at 771-72. The fact that the installed and still-functioning valves have not failed is not determinative of this issue. Plaintiff has presented expert testimony from Dr. John Ambrose that the failed Hammond 8911 valves contain a "manufacturing defect which rendered them unfit for

their intended use." (Def.'s Mem., Ex. G at 10.) He stated because the other valves were similarly (*i.e.*, defectively) manufactured, "there remains the finite possibility that conditions could arise that would result in their failure as well." (*Id.* at 9-10.) He further concluded that each of these valves is a "time bomb" because of the "intrinsic design and manufacturing defects in every valve," not just those that have failed. (Pl.'s Opp'n at 4; *see also* Def.'s Mot., Ex. G, at 10.) As such, defendant is not entitled to judgment as a matter of law with respect to plaintiff's claim for replacement damages for breach of an implied warranty of merchantability.

**E. Plaintiff's Express Warranty Claims**

Defendant argues that plaintiff cannot make a valid express warranty claim with respect to still-functioning valves because "[t]he presence of a particular ingredient does not de facto make a product 'non-conforming' unless the presence of that product manifests in the product's failure to perform the purposes for which it was manufactured and causes damages." (Def.'s Reply at 7-8, 15.) However, to succeed on a breach of express warranty claim, a plaintiff must show only that "the defendant breached an express promise made about the product sold" and notice was given, *Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 464 (D.D.C. 1997) (interpreting D.C. Code § 28:2-313), not that the product is defective. *See* Lary Lawrence, 3 *Anderson on the Uniform Commercial Code* § 2-313:223 (3d ed. 2009) ("If the plaintiff can prove that the goods do not conform to the express warranty, the plaintiff has sustained the burden of proof. The plaintiff is not required to prove that there was a defect in the goods."). The harm from a breach of express warranty is not simply the injury caused by the non-conformity, but the non-conformity itself. *See Hicks*, 107 Cal. Rptr. 2d at 772; *see also* D.C. Code § 28:2-714 (measure of damages for breach is generally "the difference . . . between the value of the goods accepted and the value they would have had if they had been *as warranted*")

(emphasis added). The issue, then, is whether plaintiff can prove that the still-functioning valves fail to conform to express promises made by the defendant.

The Court finds that plaintiff may be able to show that the valves did not conform to the alleged express warranties[8] regarding fitness for a particular purpose, UL and ANSI certification, and the claim that the valves were designed and manufactured to withstand 600 PSI of water pressure at temperatures up to 250 degrees Fahrenheit even if most of them are still working. There is evidence that suggests that the composition of all of the Hammond 8911 valves might have been inconsistent with the ANSI standard for brass, breakages notwithstanding. (Def.'s Mot., Ex. G, at 5). There is also evidence to support plaintiff's claim that defendant's manufacturing process made the valves "overly brittle" and unlikely to withstand 600 PSI of pressure. (*Id.* at 9; *see also* Pl.'s Opp'n at 14-16). And there is testimony that the valves, whether failed or operational, have only ever been subjected to pressures well below 600 PSI, such that the lack of failures in the installed valves is not inconsistent with plaintiff's claim that the valves were not manufactured to withstand higher pressure. (Pl.'s Mot., Ex. 3, at 8.) Finally, the testimony of Dr. Ambrose regarding alleged defects in the valves creates a genuine issue of fact as to whether they are fit for the purpose for which Quality Air purchased them. Therefore defendant is not entitled to judgment as a matter of law with respect to plaintiff's claim for replacement damages for breach of express warranties.

**E. Damages**

The Court need not decide if plaintiff has proven that defendant breached applicable express or implied warranties or that the appropriate damages, in the event that breaches

[8] The Court reiterates that it does not decide herein whether the express warranties alleged by Quality Air were in fact made by Hammond Valve. Rather, it holds only that the non-failure of most of the installed valves does not preclude successful claims under these warranties.

occurred, would be the cost of replacing all 13,200 valves. Indeed, as defendant notes, plaintiff must "prove any loss resulting from [a] breach" in order to recover damages under section 28:2-714. *Alcan Aluminum Corp. v. Carlton Aluminum of New England, Inc.*, 617 N.E. 2d 1005, 1010 (Mass. App. Ct. 1993). However, the Court cannot conclude that plaintiff is, as a matter of law, unable to prove that defendant breached the implied warranty of merchantability or the express warranties with respect to still-functioning valves. And, if plaintiff can prove that defendant breached these warranties, it "may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined *in any manner which is reasonable*." D.C. Code § 28:2-714(1) (emphasis added). Such damages may well include replacement costs. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* § 10-2 (5th ed. 2006) ("Replacement cost may be the proper measure [under UCC § 2-714].")

## IV. NOTICE

Defendant contends that even if plaintiff can state claims for breach of warranty, plaintiff cannot seek damages because it failed to timely notify defendant once it discovered the alleged breaches. (Def.'s Reply at 17-18.) The UCC requires a buyer who has accepted goods to "within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy." D.C. Code § 28:2-607(3). Defendant argues that although plaintiff was aware of the breaches at issue at least as early as 2005, it did not notify defendant until it filed the instant suit in April 2008. (Def.'s Reply at 17.) Yet, plaintiff has presented an affidavit from Edward Donaghue, its vice president of marketing and sales, stating that he notified Hammond Valve of valve failures as early as 2004. (Pl.'s Supp. Opp'n at 3-4; Aff. of Edward Donaghue ["Donaghue Aff."] ¶¶ 10-11.) Mr. Donaghue further

attests that Hammond Valve received additional notice of failures in 2007. (Donaghue Aff. ¶ 16.) Although Mr. Donaghue does not state that he notified defendant explicitly that plaintiff considered all of the Hammond 8911 valves, not just the broken ones, to be defective, express notice is not mandated by the statute. Constructive notice, if established, will also satisfy the notice requirement under section 28:2-607. *Witherspoon*, 964 F. Supp. at 464. For instance, this Court has found that where a plaintiff has received numerous inquiries as to the potential hazards of its products, there is at least a genuine issue of fact as to constructive notice. *Wesley Theological Seminary of United Methodist Church v. U.S. Gypsum Co.*, No. 85-1606, 1988 WL 288978, at *5 (D.D.C. Jan. 5, 1988), *rev'd on other grounds*, 876 F.2d 119 (D.C. Cir. 1989). Here, plaintiff has presented evidence that it spoke with defendants regarding valves that had broken and that a sales representative of the defendant told plaintiff he would "investigate the problem and get back to [him]." Drawing all reasonable inferences in plaintiff's favor, *Anderson*, 477 U.S. at 254, it is a question of fact whether the defendant had constructive notice in a timely manner that Quality Air had a "problem" with its Hammond 8911 valves and, therefore, plaintiff's breach of warranty claims will not be dismissed.

**CONCLUSION**

For the foregoing reasons, defendant's motion for partial summary judgment is granted in part and denied in part. Defendant's motion is granted with respect to plaintiff's claims for replacement damages based on defendant's alleged breach of the implied warranty of fitness for a particular purpose. With respect to plaintiff's claims for replacement damages based on

defendant's alleged breach of express warranties and an implied warranty of merchantability, defendant's motion is denied. A separate order accompanies this Memorandum Opinion.

**SO ORDERED.**

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: November 25, 2009